UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMY J. WANG,

               Plaintiff,           **DEMAND FOR JURY TRIAL**

                                      Case No.  18-12924

vs.                              Honorable:

BOARD OF REGENTS OF THE UNIVERSITY
OF MICHIGAN operating as the UNIVERSITY
OF MICHIGAN, and NANCY HOBBS, individually
and in her official capacity,

               Defendants.
_____

**GASIOREK, MORGAN, GRECO,
McCAULEY & KOTZIAN, P.C.**
BY:  SAM MORGAN (P36694)
Attorney for Plaintiff
30500 Northwestern Highway, Suite 425
Farmington Hills, MI 48334
(248) 865-0001
smorgan@gmgmklaw.com
_____

## COMPLAINT AND JURY DEMAND

NOW COMES the Plaintiff, AMY J. WANG, by and through her attorneys,

GASIOREK, MORGAN, GRECO, McCAULEY & KOTZIAN, P.C., and

complains against Defendants as follows:

1.      This is an action for deprivation of Plaintiff's rights under the United

States Constitution, violation(s) of the Michigan Whistleblowers Protection Act

(hereinafter the "WPA"), MCL § 15.361, and for wrongful discharge in violation of Michigan public policy, all arising out of Plaintiff's employment relationship with Defendants.

## PARTIES

2.      Plaintiff, AMY J. WANG (hereinafter "Plaintiff" or "Wang"), is an individual residing the City of Novi, in Oakland County, State of Michigan.

3.      Defendant, the BOARD OF REGENTS OF THE UNIVERSITY OF MICHIGAN (herein after the "Defendant University") is a constitutional corporate body operating and governing the UNIVERSITY OF MICHIGAN, a public entity, located in City of Ann Arbor, Washtenaw County, State of Michigan.

4.      Defendant, NANCY HOBBS (hereinafter "Defendant Hobbs"), is an individual residing in the State of Michigan, and who at all relevant times was and is employed by the Defendant University as its Associate Vice President for Finance.

5.      Plaintiff was at all relevant times employed by the Defendant University as the Director of Procurement Services and reported directly to Defendant Hobbs.

6.      Defendant Hobbs reports to Kevin Hegarty, Executive Vice President and Chief Financial Officer at the Defendant University. Mr. Hegarty reports to Mark Schlissel, President of the Defendant University. Mr. Schlissel reports to the Board of Regents.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over Plaintiff's constitutional claim under and pursuant to 28 USC § 1331 (federal question jurisdiction), 28 USC § 1343(a)(3) (jurisdiction over deprivation of Constitutional rights claims), and 42 USC § 1983 (deprivation of Plaintiff's rights under the United States Constitution).

8.     This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367 over Plaintiff's state law claims for WPA violation(s) and wrongful discharge.

9.     This Court has personal jurisdiction over the Defendant University because it is a branch of the State of Michigan formed under the Michigan Constitution.

10.     This Court has personal jurisdiction over Defendant Hobbs because she resides in and engages in regular and systematic business and other activities within the State of Michigan.

11.     On September 14, 2018, in accordance with MCL 600.6431 and 600.6452, Plaintiff filed a Notice of Intent to File Claim with the Michigan Court of Claims stating that she intended to file the claims asserted in this action against the Defendants.

12.     Venue is proper in this judicial circuit pursuant 28 U.S.C. §1391(b) and (c) because all parties reside and/or are located within the Eastern District of

3

Michigan and the events that give rise to this claim occurred within the Eastern District of Michigan.

13.     Venue is also convenient is this judicial district.

## GENERAL ALLEGATIONS

14.     Plaintiff commenced employment with the Defendant University on or about May 20, 2013, as its Executive Director for User Experience in the Information and Technology Services (or ITS) SS Service Center.

15.     Plaintiff's job performance was evaluated as successful, if not exemplary, during her first three (3) years of employment with the Defendant University.

16.     In July 2016, because Plaintiff's "superior" job performance (which was formally evaluated as "exemplary") and to equitably adjust Plaintiff's salary "to get her in the ballpark of earning close to the highest paid executive director and Information Systems Executive", the Defendant University's upper management recommended and secured pay increases of 7.6% that set Plaintiff's base salary at $195,000 per year.

17.     During the summer of 2017, Defendant Hobbs contacted Plaintiff about an opportunity to work on her team in the Finance Department, in the Director of Procurement Services role.

18.    On or about July 17, 2017, Defendant Hobbs offered Plaintiff the position of Director of Procurement Services (the "Purchasing Top Executive"), matching her current base salary and providing an additional $15,000 "signing bonus."

19.    Plaintiff accepted the Director of Procurement Services position and transitioned to that position on or about August 7, 2017.

20.    As Director of Procurement Services, Plaintiff was one of nine (9) senior administrators that reported directly to the Associate Vice President for Finance, i.e. Defendant Hobbs.

21.    As Director of Procurement Services, Plaintiff was responsible for assuming a leadership role in the development and implementation of all initiatives, policies and procedures for the Procurement Services organization as well as contributing to the strategy and vision of the Finance organization.

22.    Several functions in Procurement Services reported directly to Plaintiff, including Contract Administration, Procurement, Travel/Expense auditing, and Auxiliary Services (i.e., Printing Services, University Copy Centers, Mail Services, Space Analysis, Property Control and Disposition).

23.    During August 2017, Plaintiff met multiple times with Defendant Hobbs to discuss, among other things, how she would define success in Plaintiff's role as Director of Procurement Services.

24.     Plaintiff and Defendant Hobbs discussed the responsibilities of the position as set forth in the formal job description, and what would be put in Plaintiff's formal "work plan" so that there was something formal and written that they could reference to track Plaintiff's job performance.

25.     The Finance Department has a formal process for establishing performance expectations and evaluating employee performance against those established expectations.

26.     That process includes a performance management process calendar that is issued by Defendant Hobbs and the department's human resources officer.

27.     Formal work plans are supposed to be developed between employee and supervisor during June and July, and finalized by July 31.

28.     Coaching and feedback sessions conducted by the supervisor are supposed to occur in October and February.

29.     Finance Department management is supposed to begin scheduling peer review process meetings on or about April 1st.

30.     Self-assessments are supposed to be completed by employees in May.

31.     Draft Summary Performance Evaluations ("SPE's") are supposed to be created by the employee's supervisor(s) and manager(s) in May.

32.     A peer review process on all performance ratings is supposed to be completed during the second and third weeks of June.

33.     Supervisors are supposed to communicate SPE's to their subordinate employees during the first and second weeks of July.

34.     In early September 2017, the Finance Department's human resources officer provided Plaintiff with a template and some guidance material for use in developing Plaintiff's formal written work plan for Fiscal Year 2018, which would end on or about June 30, 2018 ("FY2018").

35.     Plaintiff then met and worked with Defendant Hobbs throughout September 2017 to draft Plaintiff's FY2018 work plan.

36.     During the next seven (7) months, from October through April 2018, Plaintiff worked effectively and proficiently on and in every area and function of her job responsibilities.

37.     Much of the new job responsibilities were a good fit for Plaintiff's skillset.

38.     Plaintiff worked hard, and extremely long hours during the week, and often worked on weekends.

39.     Plaintiff even opted to not use much if any of her paid time off, because she was full invested in helping the Procurement Services organization become successful.

40.     In conformance with the her FY2018 work plan, Plaintiff met with many people on the different campuses that her department served or interacted with

7

and made many improvements that were necessary to begin (as Hobbs had directed) changing the culture in the Procurement Services organization.

41.    Plaintiff met with Defendant Hobbs at least twice a month and tracked Plaintiff's progress to her work plan.

42.    Throughout that time frame, Defendant Hobbs never voiced or in any other way identified or articulated a deficiency or concern with regard to Plaintiff's job performance.

43.    More specifically, during the meetings in October 2017 and February 2018, where Defendant Hobbs was supposed to be providing coaching and feedback, Hobbs did not voice or identify a job performance deficiency or concern.

44.    In April 2018, after a "Procurement Discussion" meeting with the Defendant University's President, its Chief Financial Officer ("CFO") (Defendant Hobbs' immediate supervisor), Defendant Hobbs, and two other direct reports to the CFO, the CFO personally commended Plaintiff on her stellar presentation (his email message included the statement "Mission accomplished") of the issues and efforts ongoing with the Procurement Services organization.

45.    One specific responsibility that was assigned to Plaintiff in early 2018 was to assist the Defendant University with the TN Visa renewal application for one of her subordinate employees who was employed in the position of "Manager for Finance Business Systems - Strategy and Enablement."

46.    For this task, Plaintiff was required to work with the Finance Department's human resources officer, another human resources administrator that handled immigration compliance matters, the Procurement Services Business Operation Manager, and a licensed Michigan attorney employed by the Defendant University (within its International Center (the "IC")) who was specifically responsible for preparing and filing employment-based visa petitions with the United States Customs and Immigration Services ("USCIS") on behalf of the Defendant University.

47.    A TN Visa is a special nonimmigrant visa that is available under federal law and the North American Free Trade Agreement ("NAFTA") that permits qualified Mexican and Canadian citizens to work in the United States for U.S. or foreign employers in prearranged business activities at a professional level.

48.    The TN nonimmigrant program is governed by federal law and regulation.

49.    Any person who knowingly makes under oath, or under penalty of perjury knowingly subscribes as true, any false statement with respect to a material fact in any application, affidavit, or other document required by the immigration laws or regulations, or knowingly presents any such application, affidavit, or other document which contains any such false statement or which fails to contain any reasonable basis in law or fact, is a federal crime punishable by fine or (if the offense

is committed to facilitate a crime) up to 25 years in prison. See, 18 U.S.C. §§ 371, 1001(a) and (c), 1546(a).

50.    Plaintiff was not previously aware of the TN Visa program or legal requirements.

51.    Plaintiff learned from the Defendant University's IC that all individuals in TN visa status must have the intent to depart the United States, and that TN visa status is not a good long-term immigration solution.

52.    Plaintiff learned from the immigration compliance human resources administrator that her role in assisting with the subordinate employee's TN Visa renewal application was to prepare an employer's request letter to support the petition for TN Visa status that the attorney employed by the Defendant University's IC was preparing.

53.    The immigration compliance human resources administrator provided Plaintiff with a copy of the request letter that was prepared and submitted to U.S. Customs and Immigration officials by Plaintiff's predecessor (i.e., the former Director of Procurement Services) to support the subordinate employee's renewal application in April 2017.

54.    The April 2017 support letter prepared by Plaintiff's predecessor falsely represented that the Defendant University was requesting TN status for

Plaintiff's subordinate employee in the "temporary position of Computer Systems Analyst."

55.     The April 2017 support letter prepared by Plaintiff's predecessor falsely represented that Plaintiff's subordinate employee would be performing complex software analysis and design duties including the design and enhancements of higher educational financial modules and their interfaces, including procurement, accounts payables, and travel & expenses.

56.     Plaintiff recognized and had actual knowledge that that her subordinate employee was not and had not been employed by Defendant University in a temporary Computer Systems Analyst position.

57.     Plaintiff consulted with the immigration compliance human resources administrator regarding the misrepresentation of the subordinate employee's assigned position, stating that with her information technology background Plaintiff could not honestly or in good faith represent to the federal government that the subordinate employee was employed in a temporary Computer Systems Analyst position.

58.     Plaintiff then learned from the attorney who worked for Defendant University's IC that the position title that was part of the subordinate employee's email signature block caught his attention and caused him to question whether the subordinate employee was employed in a position that qualified for TN status.

11

59.     At the direction of the attorney who worked for Defendant University's IC, Plaintiff and the immigration compliance human resources administrator (on April 24 and 25, 2018) requested that the subordinate employee provide an updated and accurate list of his duties and responsibilities.

60.     The subordinate employee became annoyed and asked Plaintiff and the human resources administrator to prepare the request letter as it had been prepared in the past by Plaintiff's predecessor and his prior supervisors.

61.     The subordinate employee then provided Plaintiff and the human resources administrator with an inaccurate list of his duties and responsibilities.

62.     The human resources administrator asked the subordinate employee why he did not include his management of staff duties, which she understood to be a function of his position.

63.     The subordinate employee responded stating that to qualify for TN status, the employer's request letter had to specifically state that his job duties were that of a temporary Computer Systems Analyst.

64.     The subordinate employee acknowledged his actual position of employment with the Defendant University, which included substantial management of staff duties, did not qualify for TN status.

65.     On May 1, 2018, after much time and effort in consultation with the subordinate employee, Plaintiff sent the human resources administrator an accurate

description of the subordinate's job duties, which provided that 35% of the subordinate's time was spent on "Team Management/Leadership - managing the staff that administer and/or configure the technologies," 30% of his time was spent on "Technology Management – Manage the suppliers and technologies that the department leverages for operations," 10% of his time was spent on "Data analysis – Analyze information for system design, changes or issue resolution," and 25% of his time was spent on "Strategy & Enablement Liaison – Provide strategic planning and communications for technology related initiatives."

66.    Plaintiff's subordinate employee then stated that Plaintiff's description of his duties looked good, but he wanted to add more information that "captured" the "analysis aspect" of his role.

67.    The human resources administrator advised the subordinate employee that she was hesitant to change the description that he and Plaintiff had developed, and that the Defendant University's IC attorney had already reviewed the list of duties that Plaintiff and the subordinate employee had developed.

68.    The subordinate employee has a close personal relationship with Defendant Hobbs.

69.    Upon information and belief, the subordinate employee contacted Defendant Hobbs and complained about the manner in which his TN Visa renewal application was being handled by Plaintiff.

70.     Defendant Hobbs then intervened into the TN Visa renewal work that Plaintiff was doing, and advised Plaintiff that the Finance Department uses two kinds of job titles: "Market Title" and "Working Title".

71.     Defendant Hobbs instructed Plaintiff to change one of the subordinate employee's titles to Computer Systems Analyst.

72.     Plaintiff had multiple conversations with Defendant Hobbs about this issue and repeatedly informed Hobbs that the subordinate employee's actual position, position function, and the duties and responsibilities of his position, were substantially different than that of a Computer Systems Analyst.

73.     Plaintiff told Hobbs that they (i.e., Plaintiff, Hobbs, the Finance Department management team, the human resources organization, and the IC attorney) knew or should have known that Plaintiff's predecessor's April 2017 letter contained a material misrepresentation of fact, and Plaintiff had to fix the situation so as to change the subordinate employee's actual job classification and duties to that of a Computer Systems Analyst – which was a staff-level position, and not a manager position – otherwise, just repeating what Plaintiff's predecessor had done would be a knowing and intentional fraud or misrepresentation.

74.     Defendant Hobbs questioned Plaintiff why she had such an interest in making the subordinate employee's TN Visa renewal application so difficult, stating

14

that she did not understand why Plaintiff would not just do what her predecessor had done the previous year.

75.    Defendant Hobbs' intervention and direction to Plaintiff got the attention of the Finance Department's human resources officer, who then became more personally involved in the subordinate employee's TN Visa application process, interacting directly with the IC attorney.

76.    After a May 7, 2018 meeting with the IC (Plaintiff, Defendant Hobbs and the Finance Department's human resources officer participated), Defendant Hobbs made negative statements about the IC and their requirements, stating that the IC seemed to find ways to prevent visas from getting approved instead of being creative and finding ways to make visa applications sail through.

77.    Plaintiff told Defendant Hobbs that she would not commit fraud and intentionally misrepresent to federal customs and immigration officials that the subordinate employee was performing in a temporary position that qualified for TN status.

78.    Plaintiff then worked with the immigration compliance human resources administrator to change the subordinate employee's position and duties so that he was actually performing in a Computer Systems Analyst position.

79.    The change in the subordinate employee's position and duties meant that he was no longer a manager, and would be working in a staff-level position.

80.    The subordinate employee was not happy with these changes.

81.    Upon information and belief, the subordinate employee complained to Defendant Hobbs about these changes in his position.

82.    The Finance Department's human resources officer then intervened to develop a new, non-management position description for the subordinate employee.

83.    On June 4, 2018, Defendant University's IC Assistant Vice President for Faculty & Staff Immigration Services informed the Finance Department's human resources officer that the new position description was acceptable because it "seems substantially similar to the original description – without the management duties. Based on that position description, we can file a TN petition in good faith…"  The Assistant Vice President then stated that "[t]o get started, we'll need to receive the standard TN request…"

84.    The Finance Department's human resources officer then forwarded Plaintiff and Defendant Hobbs a "Process Authorization Form" which required a signature from Plaintiff.

85.    On June 8, 2018, the Finance Department's human resources officer sent Plaintiff and Defendant Hobbs the documents describing the subordinate employee's new position, classification and pay range, and the IC application in support of the subordinate employee's TN Visa application, and requested that Plaintiff sign the application.

16

86.     The Process Authorization Form that Plaintiff was required to sign, and did sign on June 8, 2018, expressly stated that Plaintiff understood that "[a]ny changes in the [subordinate employee's] conditions of employment (e.g. title, duties, work location, termination) will be reported to the IC."

87.     The offer letter that the Finance Department's human resources officer prepared for Plaintiff's signature stated that the subordinate employee's position would be that of a Business Systems Analyst Senior within the Procurement Services organization, and his salary would be reduced by more than $9,500 per year effective July 3, 2019.

88.     The reduction in in pay was due to the fact that the subordinate employee would no longer be working in a manager's role.

89.     Plaintiff presented the offer letter to the subordinate employee on June 8, 2018, and the subordinate employee signed the letter to reflect his acceptance.

90.     The subordinate employee was upset with the changes in his position, status and duties, as well as the reduction in pay, and he complained to Defendant Hobbs.

91.     On June 11, 2018, the Defendant University's IC attorney sent Plaintiff and the Procurement Services Manager of Business Operations a questionnaire to assist him with preparing the TN Visa petition for the subordinate employee.

92.     On June 13, 2018, the Procurement Services Manager of Business Operations requested (by email) from the Finance Department's human resources officer information about the subordinate employee's new job description and duties to help her fill out the questionnaire.

93.     On June 14, 2018, Plaintiff attended and participated in an hour-plus long meeting with Defendant Hobbs and the Finance Department's human resources officer regarding ongoing Procurement Services outreach activities.

94.     During the meeting, Defendant Hobbs spoke to Plaintiff as if Plaintiff was performing at an exceptional level and would continue to be employed as the Director of Procurement Services into the future.

95.     Defendant Hobbs did not say anything during the meeting that indicated that she was dissatisfied with Plaintiff's job performance.

96.     About midway through the June 14, 2018 meeting, Defendant Hobbs stated that she was working on "a plan" with one of her colleagues (who also reports to the CFO) that works on Organizational Design and Development projects to "reorganize" some personnel in the Procurement Services organization.

97.     Defendant Hobbs stated that she intended to reassign some Procurement Services employees, including the subordinate employee who Plaintiff had just signed off on his TN Visa application documents, so that they would report

to and be assigned by one of Hobbs' colleagues, the Executive Director for Information Quest.

98.    Plaintiff recognized that Defendant Hobbs appeared to be reorganizing personnel so that the subordinate employee could continue performing his prior position as a manager.

99.    Plaintiff also remembered that the Process Authorization Form that the IC attorney required Plaintiff to sign stated that any changes in the employee's duties and terms and conditions of employment had to be reported to the IC.

100.    Plaintiff, therefore, told Defendant Hobbs that the paperwork that she signed regarding the subordinate employee's duties and responsibilities had to be re-done, because she could not attest to the fact that the subordinate employee was performing in his new, TN status-qualifying role.

101.    Plaintiff told Defendant Hobbs that if the reporting relationship was being changed, the IC attorney had to be notified.

102.    Defendant responded to Plaintiff's statement angrily, asking "how many times do we need to sign this?"

103.    Defendant Hobbs insisted that when Plaintiff signed the document for the IC, the subordinate employee did report to her and it is not necessary for her to sign a similar statement every month.

104.   The Finance Department's human resources officer intervened and supported Plaintiff by stating that if there were any changes, they (i.e., Plaintiff and the Finance Department as a whole) had agreed that they would informed the IC of those changes.

105.   Defendant Hobbs was visibly annoyed and frustrated by Plaintiff's refusal to back down from her insistence that she must inform the IC of the change in the subordinate employee's supervisory reporting relationship.

106.   Defendant Hobbs then informed Plaintiff and the Finance Department's human resources officers that the "engagement function" (the subordinate employee's group) was never part of Procurement Services, but was part of Finance, and proceeded to invent another false explanation for why the organization changes she was planning would not really be a change in the subordinate employee's supervisory reporting relationship.

107.   Defendant Hobbs would not permit any further disagreement from Plaintiff on the subject.

108.   Later in the day on June 14, 2018, well after the aforementioned meeting with Defendant Hobbs ended, the Finance Department's human resources officer sent the Procurement Services Manager of Business Operations an email message (but did not copy Plaintiff) stating that "I'll send a breakdown of duties in a separate email. Regarding who [the subordinate employee] will report to, it['s] a

bit up in the air. Until anything different is finalized, we can use [Plaintiff's] position…"

109.  Plaintiff had a previously secured approval to take, and took, Friday, June 15 and Monday, June 18, 2018, as vacation days.

110.  On June 15, 2018, the Procurement Services Business Operations Manager forwarded the Finance Department human resources officer's aforementioned late June 14, 2018 email message to Plaintiff, stating "FYI."

111.  Also, on June 15, 2018, the attorney employed by Defendant University's IC copied Plaintiff on an email message to the Finance Department's human resources officer questioning why the subordinate employee's pay reduction was not scheduled to go into effect for a year, and looking for a copy of the written policy that described the compensation practice.

112.  It seemed clear to Plaintiff that the IC's attorney was concerned that the Finance Department was again misrepresenting that the subordinate employee was assigned to perform in a TN status qualifying position, when in reality he was still working in the management position that did not qualify for TN status (especially since even the reduced salary as tens of thousands of dollars above the published salary range for a Business Systems Analyst Senior position).

113.  On Monday, June 18, 2018, Plaintiff sent an email to the Finance Department's human resources officer stating that she thought she should report the

change in the subordinate employee's supervisor and reporting relationship to the attorney at Defendant University's IC.

114.   The Finance Department's human resources officer responded by telling Plaintiff to "let it be" because he considered Defendant Hobbs statements about the reorganization plan she was working on was "brainstorming."

115.   Later on June 18, 2018, Defendant Hobbs' administrative assistant sent Plaintiff an email message requesting that Plaintiff report to work early on the morning of June 19, 2018, for a 7:30 am meeting with Defendant Hobbs and the Finance Department's human resources officer.

116.   The next morning, on June 19, 2018, Defendant Hobbs informed Plaintiff that she relieving her from her position as Director of Procurement Services and that she wanted Plaintiff to resign under a severance agreement.

117.   Defendant Hobbs stated that Plaintiff was not demonstrating the leadership skills and abilities to create a powerful vision for Procurement Services' customers and staff.

118.   Defendant Hobbs handed Plaintiff a document that described the proposed severance, and which also stated that Hobbs would seek Plaintiff's termination if she declined the severance agreement.

119.   Plaintiff was surprised by Defendant Hobbs' announcement and the termination and asked Hobbs why she did not give her prior notification of a problem with her performance.

120.   Plaintiff referred to the numerous one-on-one meetings that she had with Defendant Hobbs every week, and the coaching and feedback sessions, and the fact that Hobbs mentioned nothing about leadership deficiencies or problems during those meetings.

121.   Defendant Hobbs falsely insisted that she had raised issues with Plaintiff, but would not provide specifics and insisted that Plaintiff take time to consider the severance proposal and how she wanted the department to spin the explanation for her departure.

122.   After the termination meeting, Plaintiff spoke with the Finance Department human resources officer about her abrupt termination.

123.   The Finance Department human resources officer told Plaintiff that he was completely blindsided by Defendant Hobbs' decision to terminate Plaintiff.

124.   The Finance Department human resources officer agreed with Plaintiff that there was no indication either before, during or after their meeting on June 14, 2018 that Defendant Hobbs was dissatisfied with Plaintiff's job performance.

125.   Plaintiff then made a request to be provided with a copy of her personnel record file.

126.   Upon receiving her personnel record file from Defendant University, Plaintiff confirmed with the Finance Department human resources officer that there was no documentation of any performance problems or deficiencies, or warnings or other advance notices of deficient performance, in Plaintiff's personnel records maintained by Defendant University.

127.   Defendant Hobbs did not follow the Defendant University's established policy and procedure for documenting problem or deficient job performance, either for or as the result of coaching and feedback meetings in October 2017 and February 2018, or in any other setting.

128.   During the ten (10) months that Defendant Hobbs was Plaintiff's immediate supervisor, Hobbs never conducted a formal or informal evaluation of Plaintiff's job performance; nor did she treat Plaintiff the same as similarly situated employees in the Finance Department who were informed in 2018 that their performance was deficient.

129.   Plaintiff declined the severance proposal and, in accordance with Defendant University's personnel policies, proceeded to a Disciplinary Review Conference ("DRC") on July 11, 2018.

130.   The DRC was conducted by Defendant Hobbs.

131.   The Finance Department's human resources officer was also present for the DRC, to facilitate the meeting.

132.    Defendant Hobbs refused to allow the DRC to be recorded electronically.

133.    Defendant Hobbs and the Finance Department human resources officer also refused Plaintiff's request to be provided with a written description of the reason or reasons for her termination, the rule(s) or policies that were at issue, or of the facts or evidence that supports the reason or reasons for termination.

134.    Instead, Defendant Hobbs read from a written list of reasons she claimed was her rationale for terminating Plaintiff's employment.

135.    Defendant Hobbs read the list of reasons quickly, and refused to repeat the list of reasons as Plaintiff attempted to take notes.

136.    Each of the reasons that Defendant Hobbs read off of her written list had not previously been identified by Defendant Hobbs or any other member of Defendant University's upper management as a performance failure or area of concern.

137.    Defendant Hobbs did not connect or relate any of her listed reasons to Plaintiff FY2018 work plan or the Finance Department's established process for evaluating employee job performance.

138.    Each of the reasons that Defendant Hobbs read off of her written list was either fabricated, mischaracterized or distorted in order to provide a false pretext to explain Hobbs' termination decision.

25

139.   Defendants did not provide Plaintiff with a fair opportunity to present her side of the story at the DRC.

140.   To the extent Plaintiff attempted to rebut Defendant Hobbs' stated reasons for termination, Hobbs was disagreeable, refused to consider any of Plaintiff's rebuttal explanation(s), and insisted that she (i.e., Hobbs) was correct and had sufficient grounds to terminate Plaintiff's employment.

141.   Defendant Hobbs also refused to explain why she had not connected or related any of her assessments of Plaintiff's job performance with her FY2018 work plan, or followed the Finance Department's process for evaluating employee job performance, or complied with the Defendant University's established policies concerning documenting deficient job performance and that require notice of dissatisfactory job performance in advance of taking adverse employment action, or why she was being treated differently than similarly situated employees in the Finance Department.

142.   During the DRC, Plaintiff complained that she believed that Defendant Hobbs' abrupt decision to seek the termination of her employment, and Hobbs' failure to follow the Finance Department's process for evaluating employee job performance, or comply with the Defendant University's established policies concerning documenting deficient job performance and which require notice of dissatisfactory job performance in advance of taking adverse employment action

against the employee, and Hobbs' disparate treatment of Plaintiff in comparison to similarly situated Finance Department employees, was retaliation for (1) Plaintiff's refusal to participate in the illegal activity of fraudulently misrepresenting the subordinate employee's employment position and duties and responsibilities to the Defendant University's IC and federal immigration and customs officials, and (2) Plaintiff's statements on June 14, 2018 and June 18, 2018, that indicated she was about to report to the licensed Michigan attorney employed by Defendant University's IC Defendant Hobbs' plan to again engage in illegal activity of fraudulently misrepresenting the subordinate employee's employment position and duties and responsibilities to the IC and federal immigration and customs officials.

143.    Defendant Hobbs was summarily dismissive of, and did not ask Plaintiff questions to explore any details of, Plaintiff's aforementioned retaliation complaint.

144.    The Finance Department's human resources officer also did not respond to Plaintiff's aforementioned retaliation complaint.

145.    On July 12, 2018, Defendants gave Plaintiff notice that her employment was terminated, effective July 13, 2018, ostensibly because "the Procurement function was not meeting expectations under [her] leadership, and the lack of progress in advancing the key priorities for the organization has resulted in a loss of confidence in [her] ability to be successful in this role."

146.   The notice also stated that Plaintiff was eligible for rehire in a different role and department within the Defendant University, but was not eligible for future employment within its Finance Department.

147.   The notice did not address Plaintiff's retaliation complaint.

148.   Plaintiff timely grieved the termination of her employment using the grievance procedure and dispute resolution policy in Defendant University's Standard Practice Guide Policies (the "SPG's").

149.   In her written grievance, and again during her in person hearing/interview before the University Grievance Review Committee on August 23, 2018, Plaintiff restated her aforementioned retaliation complaint and provided the committee with documentation to support her complaint.

150.   The lead person on the University Grievance Review Committee (one of Defendant University's human resources managers) informed Plaintiff that the committee's investigation of her grievance would be completed, and a written response to the grievance would be issued to Plaintiff by the committee, within thirty (30) days.

151.   Because of the statutory period of limitations that applies to Plaintiff's below asserted claim under the WPA, Plaintiff had to file this action before she received a response to her grievance from the University Grievance Review Committee.

## COUNT I
## VIOLATION OF 42 U.S.C.A. § 1983 FIRST AMENDMENT RETALIATION FOR ENGAGING IN PROTECTED ACTIVITY

152.   Plaintiff repeats and realleges the allegations set forth in the foregoing paragraphs as though set forth in full herein.

153.   Plaintiff enjoys rights under the First Amendment of the United States Constitution to be free of retaliation by persons acting under color of state law for engaging in protected free speech. To wit, to speak out and oppose illegal employment and immigration practices by a public entity, such as Defendant University and its officials or employees, including Defendant Hobbs.

152.   Plaintiff's protected speech opposing illegal employment and immigration practices included, among other things, her express refusal as a private citizen to commit the criminal act of knowingly subscribing as true a false statement with respect to the material fact of her subordinate employee's assigned job or job duties and responsibilities in a document required by federal immigration law and/or regulations, and/or of knowingly presenting a document which contains such a false statement or which fails to contain any reasonable basis in law or fact.

154.   Beginning in April 2018 and continuing through the DRC on July 11, 2018, Plaintiff engaged in constitutionally protected speech on a matter of public interest related to Defendant Hobbs' conduct as a public official and employer attempting to coerce Plaintiff to fraudulently misrepresent her subordinate

employee's position title and job duties for the purpose of inducing federal customs and immigration officials to grant the subordinate employee TN visa status.

155.   On June 18, 2018, and continuing through the July 12, 2018 decision to terminate Plaintiff's employment, Defendant Hobbs, acting under color of law and for personal reasons (i.e., based on her personal relationship with the subordinate employee), retaliated against Plaintiff because of her above referenced protected speech by removing Plaintiff from her position as Director of Procurement Services and terminating Plaintiff's employment.

156.   Defendants removed Plaintiff from her position as Director of Procurement Services and terminated Plaintiff's employment because of or on the basis of her constitutionally protected speech on a matter of public concern.

157.   Defendants' actions of removing Plaintiff from her position as Director of Procurement Services, terminating Plaintiff's employment, and barring Plaintiff from future employment within the Finance Department, because of her constitutionally protected speech abridged her right to freedom of speech in violation of the First Amendment of the United States Constitution.

158.   As a direct and proximate result of Defendants' wrongdoing, Plaintiff has sustained loss of earnings, earning capacity, and fringe benefits, and has suffered emotional distress, humiliation and embarrassment, loss of the enjoyment of the

ordinary pleasures of everyday life, and loss of the ability to pursue employment of choice.

## COUNT II
## VIOLATION OF 42 U.S.C.A. § 1983 FOURTEENTH AMENDMENT DENIAL OF STATE CONSTITUTIONAL RIGHTS WITHOUT AFFORDING DUE PROCESS OF LAW

159. Plaintiff repeats and realleges the allegations set forth in the foregoing paragraphs as though set forth in full herein.

160. Under the Fourteenth Amendment of the United States Constitution, Plaintiff enjoys the right to due process of law, which protects the Plaintiff from loss of state constitutional rights and her property right of continued employment without first being afforded due process of law.

161. The Defendants under color of state law deprived the Plaintiff of her due process rights by denying Plaintiff of the right to reputation, continued employment, a fair DRC, future employment within Defendant University's Finance Department, a fair post-termination grievance review, and free speech, without first affording the Plaintiff with adequate or valid due process of law, or where it was provided it was inadequate or invalid.

162. As a direct and proximate result of Defendants' wrongdoing, Plaintiff has sustained loss of earnings, earning capacity, and fringe benefits, and has suffered emotional distress, humiliation and embarrassment, loss of the enjoyment

of the ordinary pleasures of everyday life, and loss of the ability to pursue employment of choice.

## COUNT III
## VIOLATION OF THE MICHIGAN
## WHISTLEBLOWERS' PROTECTION ACT

163.   Plaintiff repeats and realleges each and every paragraph of this Complaint as though fully set forth herein.

164.   Plaintiff was an "employee" and Defendants were her "employer" or "agents" of her employer covered by and within the meaning of the WPA.  MCL § 15.361, *et. seq.*

165. Beginning in April 2018, Plaintiff reported violations of law, regulations, or rules promulgated by the United States that were committed by Plaintiff's predecessor at the direction of Defendant Hobbs to a member of a public body, i.e., the licensed Michigan attorney who was/is employed by the Defendant University's IC, to wit: Plaintiff reported the aforementioned fraudulent misrepresentation made in April 2017 by Plaintiff's predecessor when the Defendant University requested TN Visa status for the subordinate employee.

166.   Thereafter, and continuing through the DRC on June 11, 2018, Plaintiff reported and/or was about to report additional violations or suspected violations of law, regulations or rules promulgated by the United States to a member of a public body.

167.   The violations or suspected violations of law, regulation or rules that Plaintiff reported or was about to report included, but were not limited to 18 U.S.C. §§ 371, 1001(a) and (c), 1546(a).

168.   Defendants retaliated against Plaintiff for reporting or being about to report the violations or suspected violations of law, regulation or rules of the United States to a member of a public body by removing Plaintiff from her position as Director of Procurement Services, terminating Plaintiff's employment, and instituting a restriction that bars Plaintiff from obtaining employment in the future within the Defendant University's Finance Department.

169.   The aforementioned retaliation by Defendants and their agents violated Plaintiff's rights under the WPA.

170.   Defendant Hobbs directed the retaliation be taken or imposed against Plaintiff.

171.   Defendants retaliatory actions were intentional, wanton, willful, malicious and taken in bad faith, in deliberate disregard of and with reckless indifference to Plaintiff's rights and sensibilities.

172.   As a direct and proximate result of Defendants' wrongdoing, Plaintiff has sustained loss of earnings, earning capacity, and fringe benefits, and has suffered emotional distress, humiliation and embarrassment, loss of the enjoyment

of the ordinary pleasures of everyday life, and loss of the ability to pursue employment of choice.

## COUNT IV
## RETALIATION IN VIOLATION OF MICHIGAN'S ESTABLISHED PUBLIC POLICY

173.    Plaintiff repeats and realleges each and every paragraph of this Complaint as though fully set forth herein.

174.    During the course of her employment with the Defendant University, Plaintiff refused to violate or acquiesce in the violation of federal immigration and other laws, regulations, and rules promulgated by the United States, and refused to engage in fraudulent or suspected criminal activity in the course of creating documents and/or providing information to United States Customs and Immigration officials, at the request and direction of her immediate supervisor (i.e., Defendant Hobbs).

175.  In particular, Plaintiff refused to engage or acquiesce in the criminal activity prohibited by 18 U.S.C. §§ 371, 1001(a) and (c), 1546(a) when requesting TN Visa status for her subordinate employee.

176. Defendants removed Plaintiff from her position as Director of Procurement Services, terminated Plaintiff's employment, and instituted a restriction that bars Plaintiff from obtaining employment in the future within the

Defendant University's Finance Department, because she refused to engage or acquiesce in the criminal activity prohibited by 18 U.S.C. §§ 371, 1001(a) and (c), 1546(a) when requesting TN Visa status for her subordinate employee.

177. Defendants treatment and termination of Plaintiff's employment violated clearly established State of Michigan public policy that an employer may not terminate or discharge an employee because the employee fails or refuses to commit a crime or violate the law in the course of her employment or as a term of continued employment.

178. Defendants retaliatory actions were intentional, wanton, willful, malicious and taken in bad faith, in deliberate disregard of and with reckless indifference to Plaintiff's rights and sensibilities.

179. As a direct and proximate result of Defendants' wrongdoing, Plaintiff has sustained loss of earnings, earning capacity, and fringe benefits, and has suffered emotional distress, humiliation and embarrassment, loss of the enjoyment of the ordinary pleasures of everyday life, and loss of the ability to pursue employment of choice.

## RELIEF REQUESTED

WHEREFORE, Plaintiff Amy Wang requests that this Honorable Court grant the following remedies:

a.      Declare that the aforementioned practices and actions of Defendants are unlawful and unconstitutional;

b.      Declare that the acts and practices outlined above are in violation of the WPA;

c.      Enjoin and permanently restrain these practices;

d.      Direct Defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated;

e.      Award Plaintiff all lost wages and value of lost employee benefits, past and future, to which she is entitled;

f.      Award Plaintiff compensatory damages for mental anguish, emotional distress, humiliation and injury to her reputation;

g.      Award Plaintiff punitive and/or exemplary damages;

h.      Award Plaintiffs reasonable attorney fees and costs, including expert witness fees; and

i.      Grant such other legal or equitable relief as this Court deems appropriate.

## DEMAND FOR TRIAL BY JURY

Plaintiff, Amy Wang, by her attorneys, GASIOREK, MORGAN, GRECO,

MCCAULEY & KOTZIAN P.C., demands a trial by Jury.

Respectfully submitted,

**GASIOREK, MORGAN, GRECO,
MCCAULEY & KOTZIAN, P.C.**

BY:   /s/*Sam G. Morgan*
        SAM G. MORGAN, (P36694)
        Attorney for Plaintiff
        30500 Northwestern Hwy, Ste. 425
        Farmington Hills, MI 48334
        (248) 865-0001
        smorgan@gmgmklaw.com

Date:  September 17, 2018